**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

MICHAEL LUCERO, on behalf of himself
and others similarly situated,

     Plaintiff,

v.                                    Case No. 1:20-cv-00106-JB-KK

TYSON FOODS, INC.; CARGILL MEAT
SOLUTIONS CORP.; JBS USA FOOD
COMPANY; and NATIONAL BEEF
PACKING COMPANY, LLC,

     Defendants.

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iv

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................ 3

I.      THE PARTIES. .................................................................................... 3

II.     THE COMPREHENSIVE FEDERAL SYSTEM REGULATING THE
        PRODUCTION, LABELING, AND SALE OF BEEF IN THE UNITED
        STATES. ............................................................................................ 5

III.    THE USDA REGULATES COUNTRY-OF-ORIGIN STATEMENTS. ............... 8

        A.     In the Past, The USDA *Required* Beef Products To State Their
               Country Of Origin. ................................................................... 8

        B.     The WTO Concluded The USDA's Mandatory Country-Of-Origin
               Labeling Requirement Was Improper. ......................................... 9

        C.     Today, The USDA Approves—But Does Not Require—Country-Of-
               Origin Statements For Beef Products. ......................................... 10

IV.     LUCERO'S CLAIMS. ........................................................................... 12

STANDARD OF REVIEW ................................................................................ 13

ARGUMENT .................................................................................................. 15

I.      FEDERAL LAW PREEMPTS PLAINTIFF'S CLAIMS. .................................. 15

II.     PLAINTIFF'S CLAIMS ARE BARRED BY THE DORMANT
        COMMERCE CLAUSE. ........................................................................ 19

        A.     The Dormant Commerce Clause Prohibits State Action That
               Discriminates Against Foreign Or Interstate Commerce. ............... 19

        B.     Plaintiff's Complaint Fails Because It Seeks To Impose a Beef
               Labeling Scheme That Would Interfere with Foreign Commerce. .... 22

III.    PLAINTIFF'S CLAIMS SHOULD BE DISMISSED UNDER THE
        PRIMARY JURISDICTION DOCTRINE. .................................................... 25

IV.     PLAINTIFF'S UPA CLAIM FAILS AS A MATTER OF LAW ......................... 27

        A.     As a Competitor, Plaintiff Lacks Standing To Assert A UPA Claim. ....... 28

        B.     Plaintiff's UPA Claim Also Fails Because the Statutory Safe Harbor
               Permits Defendants' Labeling Practices. .................................... 28

V.      PLAINTIFF'S UNJUST ENRICHMENT CLAIM FAILS BECAUSE
        PLAINTIFF'S CATTLE SALES ARE GOVERNED BY EXPRESS
        CONTRACTS. .................................................................................... 31

VI.    PLAINTIFF'S COMPLAINT DOES NOT SATISFY *IQBAL* AND
       *TWOMBLY.* ........................................................................................................ 32

VII.   THE COURT SHOULD DISMISS THE COMPLAINT WITH
       PREJUDICE. ...................................................................................................... 34

VIII.  ALTERNATIVELY, THE COURT SHOULD DISMISS FOR LACK OF
       PERSONAL JURISDICTION. ............................................................................ 35

CONCLUSION ............................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*ABQ Uptown, LLC v. Davide Enters., LLC,*
No. CIV 13-0416 JB/KK, 2015 WL 8364799, at *31 (D.N.M. Oct. 19, 2015) ......... 31

*Abraham v. WPX Energy Prod.,*
LLC, 20 F. Supp. 3d 1244 (D.N.M. 2014) ............................................................. 31, 32

*All One God Faith, Inc. v. Hain Celestial Grp., Inc.,*
No. C 09-3517 SI, 2012 WL 3257660 (N.D. Cal. Aug. 8, 2012) ................................ 27

*Antilles Cement Corp. v. Fortuno,*
670 F.3d 310 (1st Cir. 2012) ........................................................................... 2, 23, 24

*Archuleta v. Wagner,*
523 F.3d 1278 (10th Cir. 2008) ................................................................................. 13

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................... 14, 32, 33

*Atuahene v. City of Hartford,*
10 F. App'x 33 (2d Cir. 2001) ................................................................................. 33

*Bacchus Imports, Ltd., v. Dias,*
468 U.S. 263 (1984) ........................................................................................... 20, 21

*Barnes v. Campbell Soup Co.,*
No. C 12-05185 JSW, 2013 WL 5530017 (N.D. Cal. July 25, 2013) ................... 17, 27

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................... 14, 32

*Board of Trustees of Univ. of Ill. v. United States,*
289 U.S. 48 (1933) ..................................................................................................... 19

*Bristol-Myers Squibb Co. v. Superior Court of Cal.,*
137 S. Ct. 1773 (2017) ...................................................................................... 3, 35, 36

*Brower v. Campbell Soup Co.,*
243 F. Supp. 3d 1124 (S.D. Cal. 2017) ..................................................................... 18

*C.H. v. Los Lunas Sch. Bd. of Educ.,*
852 F. Supp. 2d 1344 (D.N.M. 2012) ......................................................................... 32

*Choate v. Champion Home Builders Co.*,
  222 F.3d 788 (10th Cir. 2000) ............................................................................ 15, 16

*Coll v. First America Title Insurance Co.*,
  No. CV 12-0048 RB/LFG, 2012 WL 12895364, at *7 (D.N.M. Sept. 18, 2012) . 23, 30

*Craten v. Foster Poultry Farms Inc.*,
  305 F. Supp. 3d 1051 (D. Ariz. 2018) ....................................................................... 18

*Craten v. Foster Poultry Farms Inc.*,
  No. CV-15-02587-PHX-DLR, 2018 WL 834937 (D. Ariz. Feb. 13, 2018) ............... 15

*Elliott Indus. Ltd. P'ship v BP Am. Prod. Co.*,
  407 F.3d 1091 (10th Cir. 2005) .......................................................................... 31, 32

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*,
  476 F.3d 326 (5th Cir. 2007) ................................................................................... 16

*Ferro v. Ry. Express Agency, Inc.*,
  296 F.2d 847 (2d Cir. 1961) ..................................................................................... 34

*Friends of Santa Fe County v. LAC Minerals, Inc.*,
  892 F. Supp. 1333 (D.N.M. 1995) ............................................................................ 25

*Gale v. Smith & Nephew, Inc.*,
  989 F. Supp. 2d 243 (S.D.N.Y. 2013) ....................................................................... 15

*Gee v. Pacheco*,
  627 F.3d 1178 (10th Cir. 2010) ................................................................................ 33

*Grynberg v. Koch Gateway Pipeline Co.*,
  390 F.3d 1276 (10th Cir. 2004) ................................................................................ 14

*Hawver v. Nuss*,
  No. 5:14-CV-04084-DGK, 2015 WL 1034375 (D. Kan. Mar. 10, 2015) ................... 14

*Hodgson v. Farmington City*,
  675 F. App'x 838 (10th Cir. 2017) ........................................................................... 14

*Hughes v. Oklahoma*,
  441 U.S. 322 (1979) ........................................................................................... 20, 21

*In re Dental Supplies Antitrust Litig.*,
  No. 16 Civ. 696 (BMC)(GRB), 2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017) ......... 36

*In re Zyprexa Prods. Liab. Litig.*,
   549 F. Supp. 2d 496 (E.D.N.Y. 2008) ........................................................ 15

*Intri–Plex Techs., Inc. v. Crest Grp., Inc.*,
   499 F.3d 1048 (9th Cir. 2007) ................................................................... 11

*Japan Line, Ltd. v. Los Angeles Cty.*,
   441 U.S. 434 (1979) ...................................................................... 20, 21, 23

*Kan. Penn Gaming, LLC v. Collins*,
   656 F.3d 1210 (10th Cir. 2011) ................................................................. 33

*Kuenzig v. Kraft Foods, Inc.*,
   2011 WL 4031141 (M.D. Fla. Sept. 12, 2011) .................................... 11, 15

*La Vigne v. Costco Wholesale Corp.*,
   284 F. Supp. 3d 496 (S.D.N.Y. 2018)........................................................ 18

*Lane v. Capital Acquisitions & Mgmt. Co.*,
   No. 04-60602CIV, 2006 WL 4590705 (S.D. Fla. Apr. 14, 2006) .............. 33

*Lavigne v. First Cmty. Bancshares, Inc.*,
   330 F.R.D. 293, 297 (D.N.M. 2019)......................................................... 36

*Maine v. Taylor*,
   477 U.S. 131 (1986)................................................................................... 21

*Meaunrit v. ConAgra Foods Inc.*,
   2010 WL 2867393 (N.D. Cal. July 20, 2010)............................................ 18

*Meaunrit v. Pinnacle Foods Grp.*,
   2010 WL 1838715 (N.D. Cal. May 5, 2010) ............................................. 19

*Medina v. Bauer*,
   No. 02 Civ. 8837 (DC), 2004 WL 136636 (S.D.N.Y. Jan. 27, 2004) ........ 33

*Mount Olivet Cemetery Ass'n v. Salt Lake City*,
   164 F.3d 480 (10th Cir. 1998) ................................................................. 16

*Mulford v. Altria Grp., Inc.*,
   506 F. Supp. 2d 733 (D.N.M. 2007) ......................................................... 29

*Muller v. Islands at Rio Rancho Homeowners Ass'n*,
   Civil No. 13-351 LFG/RHS, 2013 WL 12157872, at *4 (D.N.M. Oct. 4, 2013)........ 14

*Nat'l Meat Ass'n v. Harris*,
  565 U.S. 452 (2012) ............................................................................ 5, 16

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*,
  511 U.S. 93 (1994) .............................................................................. 21, 23

*Peterson v. Saperstein*,
  267 F. App'x 751 (10th Cir. 2008) ...................................................... 14

*Phelps v. Hormel Foods Corp.*,
  244 F. Supp. 3d 1312 (S.D. Fla. 2017) .................................... 18, 30, 31, 35

*Philadelphia v. New Jersey*,
  437 U.S. 617 (1978) ............................................................................ 21

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) ............................................................................ 22

*Plumber's Local Union No. 690 Health Plan v. Apotex Corp.*,
  Civ. A. No. 16-665, 2017 WL 3129147 (E.D. Pa. July 24, 2017) ............... 37

*Ranchers-Cattlemen Action Legal Fund v. USDA*,
  NO: 2:17-CV-223-RMP, 2018 WL 2708747 (E.D. Wa. Jun. 6, 2018) ........... 16

*Robbins v. Oklahoma*,
  519 F.3d 1242 (10th Cir. 2008) .......................................................... 32, 33

*S. Utah Wilderness All. v. Bureau of Land Mgmt.*,
  425 F.3d 735 (10th Cir. 2005) ............................................................ 25

*Safe Streets Alliance v. Hickenlooper*,
  859 F. 3d 865 (10th Cir. 2017) ............................................................ 33

*SEC v. Goldstone*,
  952 F. Supp. 2d 1060 (D.N.M. 2013) .................................................... 14

*Shalikar v. Asahi Beer U.S.A., Inc.*,
  2017 WL 9362139 (C.D. Cal. Oct. 16, 2017) ......................................... 11

*Sillas v. Geo Group, Inc.*,
  Civ. No. 15-256 JCH/KK, 2015 WL 13651176, at *2 (D.N.M. Oct. 22, 2015) ... 13, 14

*Skilstaf, Inc. v. CVS Caremark Corp.*,
  669 F.3d 1005 (9th Cir. 2012) ............................................................ 11

*Spratley v. FCA US LLC*,
No. 3:17-CV-0062, 2017 WL 4023348 (N.D.N.Y. Sept. 12, 2017) ........................... 37

*Taradejna v. General Mills, Inc.*,
909 F. Supp. 2d 1128 (D. Minn. 2012) .................................................. 25, 27

*Trazo v. Nestle USA, Inc.*,
2013 WL 4083218 (N.D. Cal. Aug. 9, 2013) ............................................ 18

*Trojan Techs., Inc. v. Pennsylvania*,
916 F.2d 903 (3d Cir. 1990) ............................................................ 20

*United Source One, Inc. v. USDA*,
865 F.3d 710 (D.C. Cir. 2017) .......................................................... 5

*United States v. Aossey*,
854 F.3d 453 (8th Cir. 2017) ........................................................... 5

*United States v. Durham*,
902 F.3d 1180 (10th Cir. 2018) ........................................................ 20

*United States v. W. Pac. R.R. Co.*,
352 U.S. 59 (1956) ..................................................................... 25

*United States v. Wrightwood Dairy Co.*,
315 U.S. 110 (1942) ................................................................... 22

*Vilar v. Equifax Info. Servs., LLC*,
No. CIV 14–0226 JB/KBM, 2014 WL 7474082, at *26 (D.N.M. Dec. 17,
2014) ................................................................................ 33

*Walden v. Fiore*,
571 U.S. 277 (2014) ................................................................... 35

*Webb v. Trader Joe's Co.*,
Case No.: 19-CV-1587-CAB-WVG, 2019 WL 5578225 (S.D. Cal. Oct. 29,
2019) ............................................................................ 18, 35

*Wenokur v. AXA Equitable Life Ins. Co.*,
No. CV-17-00165-PHX-DLR, 2017 WL 4357916 (D. Ariz. Oct. 2, 2017) ............... 36

*Zamora v. Wells Fargo Home Mortgage*,
No. CV 12-0048 RB/LFG, 2012 WL 12895364, at *7
(D.N.M. Sept. 18, 2012) ............................................................ 29, 30

**STATE CASES**

*Am. Meat Inst. v. Leeman*,
    180 Cal. App. 4th 728 (2009) ................................................................... 19

*Arnold v. Kroger Co.*,
    45 N.E.3d 1092 (Ohio App. 2016) ........................................................... 19

*Gandydancer, LLC v. Rock House CGM, LLC*,
    453 P.3d 434 (N.M. 2019) ........................................................................ 28

*Ontiveros Insulation Co. v. Sanchez*,
    3 P.3d 695 (N.M. Ct. App. 2000) ............................................................. 34

*Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*,
    113 P.3d 347 (N.M. Ct. App. 2005) ......................................................... 28

*Valdez v. State*,
    54 P.3d 71 (N.M. 2002) ............................................................................ 30

**FEDERAL STATUTES**

5 U.S.C. § 553(e) ............................................................................................ 27

7 U.S.C. § 1638(1) .......................................................................................... 10

21 U.S.C. § 601 *et seq.* ................................................................................... 5

21 U.S.C. § 601(j) ............................................................................................ 5

21 U.S.C. § 606 ............................................................................................... 17

21 U.S.C. § 606(a) ........................................................................................ 6, 7

21 U.S.C. § 607(d) ....................................................................................... 5, 11

21 U.S.C. § 620 ............................................................................................... 12

21 U.S.C. § 678 ....................................................................................... 1, 16, 17

28 U.S.C. § 2702 ............................................................................................. 36

Antitrust Act § 57-1-16(A) ............................................................................. 30

Consolidated Appropriations Act ................................................................... 10

Farm Security and Rural Investment Act ......................................................... 8

Food, Conservation, and Energy Act of 2008 ...................................................... 9

Poultry Products Inspection Act, 21 U.S.C. § 451 *et seq.* ............................... 5, 18

**STATE STATUTES**

New Mexico Statutes § 57-12-7 ................................................................ 29, 30

New Mexico Title Insurance Act ..................................................................... 30

New Mexico Unfair Practices Act ............................................................... passim

**RULES**

Rule 8 .......................................................................................................... 33

Rule 12(b)(6) ............................................................................................... 14

**REGULATIONS**

7 C.F.R § 1.28 .............................................................................................. 27

7 C.F.R. § 54.16 ............................................................................................. 7

7 C.F.R. § 54.17 ............................................................................................. 7

7 C.F.R. § 65.300(e) ..................................................................................... 22

9 C.F.R. § 317.8(a) ......................................................................................... 6

9 C.F.R. § 392.5(a) ....................................................................................... 27

9 C.F.R. § 412.1(a) .................................................................................... 6, 17

58 Fed. Reg. 632 (Jan. 6, 1993) ..................................................................... 5

66 Fed. Reg. 41160, at 41160-61 (Aug. 7, 2001) ........................................ 12

Arbitrator Decision, *United States—Certain Country of Origin Labelling (COOL) Requirements*, ¶ 7.1 ................................................................................. 10

Panel Report, *United States—Certain Country of Origin Labelling Requirements*, ¶¶ 2.1-2.3 ............................................................................................... 9, 10

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I, § 8, cl. 3 ...................................................................... 19

U.S. Constitution Due Process Clause ................................................................ 35

**OTHER AUTHORITIES**

Cassidy L. Woodard, *From Cattle Drives to Labeling Legislation: The Implications of Mandatory Country of Origin Labeling on the Beef Industry*, 47 Tex. Tech L. Rev. 399 (2015) ................................................................... 22

Food Safety Inspection Service's Food Standards and Labeling Policy Book, available at https://www.fsis.usda.gov/wps/wcm/connect/7c48be3e-e516-4ccf-a2d5-b95a128f04ae/Labeling-Policy-Book.pdf?MOD=AJPERES ............................ 11

"Food Standards and Labeling Policy Book" ("FSIS Labeling Book") ........................... 11

FSIS-2019-0024-0001 (Oct. 23, 2019), https://www.regulations.gov/docket?D=FSIS-2019-0024 ........................................... 26

USDA, *Inspection & Grading of Meat and Poultry*, https://www.fsis.usda.gov/wps/portal/fsis/topics/food-safety-education/get-answers/food-safety-fact-sheets/production-and-inspection/inspection-and-grading-of-meat-and-poultry-what-are-the-differences_/inspection-and-grading-differences ........................................................................................ 6

## INTRODUCTION

Plaintiff's Complaint is a direct challenge to federally approved beef labels and is therefore preempted by federal law and should be dismissed with prejudice. In short, Plaintiff claims that the label statement "Product of the U.S." is misleading when applied to certain beef products—Plaintiff does not bother to say which—made from cattle that were not exclusively born, raised, and slaughtered in the United States. But the "Product of the U.S." label statements Plaintiff challenges *were approved* by the U.S. Department of Agriculture ("USDA"), and Plaintiff's complaint is therefore preempted by the Federal Meat Inspection Act's ("FMIA") sweeping preemption clause, 21 U.S.C. § 678, which—among other things—expressly preempts state law requirements "in addition to, or different than" federal labeling requirements.

The USDA *directly addresses* when a beef product can be labeled as a "Product of the U.S." Specifically, in its Food Standards and Labeling Policy Book, the USDA explains that a beef product qualifies as a "Product of the U.S." if it undergoes any aspect of processing in the United States. Plaintiff's state-law challenge to this federal standard is preempted.

In an attempt to avoid federal preemption, Plaintiff ignores the USDA's judgment and argues that the USDA is "considered to be silent as to [country-of-origin-labeling] regulations regarding beef and pork post 2015." (Dkt. 1-1 ("Am. Compl.") ¶ 4.) As shown in detail below, this is demonstrably false. Before 2015, federal law *required* retailers to identify a beef product's country of origin. Following a decision at the World Trade Organization in 2015, Congress removed the *mandatory* country-of-origin-labeling

requirement for beef products. But federal law still ***permits*** a beef product label to state that it is a "Product of the U.S.," if it meets the standards established by the USDA.

To be clear, Plaintiff ***does not*** claim that Defendants fail to meet the USDA's standard or that the USDA did not approve the beef product labels he now challenges. In fact, the very products and labels pictured in Plaintiff's Complaint show that they were approved by the USDA—as all beef products sold in the United States must be. (Am. Compl. ¶ 26.) Instead, Plaintiff argues that New Mexico law should override Congress and the USDA and impose a mandatory beef labeling regime that Congress already repealed. The fatal preemption problem inherent in that claim is stark and unavoidable. The USDA's approval of the products and labels preempts Plaintiff's claims. That is black-letter law, and it ends the case.

Plaintiff's claims are also barred by the Dormant Commerce Clause because he seeks to impose a labeling regime that would discriminate against what he—but not Congress or the USDA—considers to be "foreign" beef. This would necessarily interfere with the federal government's exclusive power to regulate foreign commerce, and thus Plaintiff's claims are barred. The First Circuit reached exactly that conclusion when it struck down a Puerto Rican law that "require[d] companies that sell foreign cement to place a different label on their products than companies that sell domestic cement." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 331 (1st Cir. 2012). The same logic applies here, and it dooms Plaintiff's claims.

Even if Plaintiff's claims were not preempted by federal law and barred by the Dormant Commerce Clause—and they are—they should be dismissed for several additional reasons. First, the Court should defer to the USDA's expertise and dismiss the case under the primary jurisdiction doctrine. If Plaintiff has concerns with how the USDA, in carrying out its statutory mandate, determines whether a beef product qualifies as a "Product of the U.S.," he should present the issue to the agency. Second, Plaintiff's claim under the New Mexico Unfair Practices Act ("UPA") fails because Lucero, as a competitor, lacks standing to pursue such a claim and because the conduct he challenges falls within the UPA's safe harbor for conduct approved by federal law. Third, Plaintiff's Complaint fails to include any specific allegations about any particular beef product or any individual Defendant and therefore fails to state a plausible claim.

In sum, each of Plaintiff's claims fails as a matter of law and should be dismissed with prejudice. But if the Court concludes that Plaintiff has stated any actionable claim, the Court should, at minimum, dismiss all claims asserted on behalf of residents outside of New Mexico. Under the Supreme Court's recent *Bristol-Myers* decision, the law is clear that the Court has personal jurisdiction over the out-of-state Defendants ***only*** as to the claims of New Mexico residents.

## FACTUAL BACKGROUND

## I.    THE PARTIES.

Plaintiff Michael Lucero ("Lucero") is a "long-time producer of beef cattle with a multi-generational history of ranching in New Mexico." (Am. Compl. ¶ 14.) Lucero allegedly "engage[s] in conservation efforts to produce beef in an environmentally sound

and socially conscious manner." (*Id.* ¶ 15.) Lucero also alleges he "ranches in an environmentally responsible manner with concern for food safety standards and humane animal handling standards and expects that consumers will rely on upon [sic] those actions in making a decision on purchasing beef." (*Id.* ¶ 11.) Lucero claims Defendants' alleged conduct tends to "to take away market share from competitors" and enables them to "pay lower prices to domestic producers, like [] Lucero, thereby increasing [Defendants'] own sales and profits." (*Id.* ¶ 12.)

*Defendant Cargill Meat Solutions Corporation* ("CMS") is a wholly-owned subsidiary of Cargill, Incorporated. CMS is headquartered in Wichita, Kansas. (*Id.* ¶ 17.) Cargill does not own any beef processing plants in New Mexico.

*Defendant JBS USA Food Company* ("JBS") is a Delaware corporation with its principal place of business in Greeley, Colorado that has subsidiaries. Neither JBS nor its subsidiaries own any beef processing plants in New Mexico.

*Defendant National Beef Packing Company, LLC* ("National") is a Delaware corporation with its principal place of business in Kansas City, Missouri. (*Id.* ¶ 19.) National does not own any beef processing plants in New Mexico.

*Defendant Tyson Foods, Inc.* ("Tyson") is a parent company, headquartered in Springdale, Arkansas, that owns a number of subsidiary companies. (*Cf. id.* ¶ 16.) Tyson, through these subsidiaries, sells beef to retailers, wholesalers, and distributors around the country. Neither Tyson nor any of its subsidiaries own any beef processing plants in New Mexico.

## II.   THE COMPREHENSIVE FEDERAL SYSTEM REGULATING THE PRODUCTION, LABELING, AND SALE OF BEEF IN THE UNITED STATES.

Because this case is about the labeling of beef products, it is critical to understand the comprehensive federal regulation of virtually every aspect of the beef industry. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455-56 (2012) (federal law "regulates a broad range of activities" related to meat processing). Of particular importance here, the labels on beef products are **exclusively** regulated by the FMIA, codified at 21 U.S.C. § 601 *et seq.*[1] Among other things, the FMIA says that meat products may not be sold "under any . . . labeling which is false or misleading, . . . but . . . labeling and containers which are not false or misleading and which are approved by the Secretary [of Agriculture] are permitted." § 607(d); *see also* § 601(a) (defining "Secretary"). The FMIA allows the USDA to ban "any . . . labeling" for meat products that it finds to be "false or misleading in any particular." § 607(e).

The USDA exercises this exclusive authority over meat product labels through its Food Safety and Inspection Service ("FSIS"). *See* Nutrition Labeling of Meat and Poultry Products, 58 Fed. Reg. 632 (Jan. 6, 1993); *see also United Source One, Inc. v. USDA*, 865 F.3d 710, 711 (D.C. Cir. 2017); *United States v. Aossey*, 854 F.3d 453, 454 (8th Cir. 2017). FSIS administers a comprehensive label approval program which ensures that no meat products "bear any false or misleading marking, label, or other labeling and [that] no

---

[1] The FMIA covers products made from "the carcass of any cattle, sheep, swine, or goats." 21 U.S.C. § 601(j). Products made from chicken are covered by the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. § 451 *et seq.*

statement, word, picture, design, or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling." 9 C.F.R. § 317.8(a).

Following that rule, FSIS has provided by regulation (9 C.F.R. § 412.1(a)) that "[n]o final label may be used on any [meat] product unless the label has been submitted for approval to FSIS Labeling and Program Delivery Staff, accompanied by FSIS Form 7234–1, Application for Approval of Labels, Marking, and Devices, and approved by such staff." In other words, all meat product labels—with exceptions not relevant here—must be submitted to and approved for use by FSIS before entering the marketplace.

FSIS also "inspects all raw meat and poultry sold in interstate and foreign commerce." USDA, *Inspection & Grading of Meat and Poultry*, https://www.fsis.usda.gov/wps/portal/fsis/topics/food-safety-education/get-answers/food-safety-fact-sheets/production-and-inspection/inspection-and-grading-of-meat-and-poultry-what-are-the-differences_/inspection-and-grading-differences (last modified June 3, 2014) [hereinafter *Inspection & Grading*]; *see also* 21 U.S.C. § 606(a) ("[T]he [USDA] shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all meat food products prepared for commerce . . . ."). Packaged meat that is inspected by the USDA will "have an inspection mark which identifies the plant on the label," as shown below:



*Inspection & Grading*; *see also* § 606(a) ("[I]nspectors shall mark, stamp, tag, or label as 'Inspected and passed' all such products found to be not adulterated"). In this example, the stamp would be applied to a "processed product"—as opposed to raw meat—inspected at Establishment 38, a number assigned to the plant where the product was produced.

In addition, beef producers and processors may request that an "official grader" assign quality grades to whole beef carcasses. *See* 7 C.F.R. § 54.16 ("The marking of products, or their containers, as required by this section shall be done by official graders or under their immediate supervision."). For example, beef assessed as "Prime grade" will bear a stamp like this:



*Inspection & Grading*; *see also* 7 C.F.R. § 54.17. This grading will be stamped on a carcass or side of beef. *Id.*

## III.  THE USDA REGULATES COUNTRY-OF-ORIGIN STATEMENTS.

Plaintiff Lucero claims that the USDA is "silent as to [country-of-origin-labeling] regulations regarding beef and pork post 2015." (Am. Compl. ¶ 4.) This is incorrect. Explaining why requires a bit of history.

### A.  In the Past, The USDA *Required* Beef Products To State Their Country Of Origin.

In 2002, Congress passed the Farm Security and Rural Investment Act (the "2002 Farm Bill"). Pub. L. No. 107-171, §§ 281-82 116 Stat. 134, 533-35 (2002). The 2002 Farm Bill required retailers of certain agricultural products, including beef, to identify the products' country of origin. *Id.* §§ 281-282. The 2002 Farm Bill defined "covered commodities" to include, among other things, "(i) muscle cuts of beef, lamb, and pork; [and] (ii) ground beef, ground lamb, and ground pork." *Id.* § 281. For those covered products, retailers were required to "inform consumers, at the final point of sale of the covered commodity to consumers, of the country of origin of the covered commodity." *Id.* § 282.

Under the 2002 Farm Bill, a beef product qualified as a product of the United States *only* if the product was "exclusively from an animal that is exclusively born, raised, and slaughtered in the United States (including from an animal exclusively born and raised in Alaska or Hawaii and transported for a period not to exceed 60 days through Canada to the United States and slaughtered in the United States)." *Id.* Products *not* "born, raised, and slaughtered in the United States" could not constitute a "Product of the U.S.A." *Id.*

In 2008, Congress amended the country-of-origin labeling requirements in the Food, Conservation, and Energy Act of 2008 ("2008 Farm Bill"). Pub. L. No. 110-234, § 11002, 122 Stat. 923, 1351-54 (2008). The 2008 Farm Bill established four discrete descriptors of a beef product's origin: (1) United States country of origin; (2) multiple countries of origin; (3) imported for immediate slaughter; and (4) foreign country of origin. *Id.*

### B. The WTO Concluded The USDA's Mandatory Country-Of-Origin Labeling Requirement Was Improper.

In 2008, Canada and Mexico challenged the United States' country-of-origin requirements in the World Trade Organization. *See* Panel Report*, United States—Certain Country of Origin Labelling (COOL) Requirements*, ¶¶ 2.1-2.3, WTO Doc. WT/DS384/R (Nov. 18, 2011). In short, Canada and Mexico claimed the USDA's country-of-origin labeling requirements had the effect of discouraging consumers from purchasing foreign products and raising costs for foreign producers. *E.g.*, *id.* ¶ 7.265. A WTO panel issued a decision accepting Canada and Mexico's claim that designating beef as a "Product of U.S.A." disincentivized purchasers from buying foreign products. *Id.* The WTO Appellate Body affirmed the Panel's ultimate conclusion. *See* Appellate Body Report, *United States—Certain Country Of Origin Labelling (COOL) Requirements*, WTO Doc. WT/DS384/AB/R (June 29, 2012).

The WTO then ordered the United States to amend its country-of-origin labeling requirements by May 23, 2013. *See* Arbitration Under Article 21.3(c) of the Understanding on Rules and Procedures Governing the Settlement of Disputes, *United States—Certain Country of Origin Labelling (COOL) Requirements*, ¶ 123, WTO Doc. WT/DS384/24

(Dec. 4, 2012). In response, the USDA finalized a new rule, which Canada and Mexico challenged in a *second* WTO proceeding. *See* Appellate Body Report, *United States—Certain Country of Origin Labelling (COOL) Requirements*, ¶¶ 1.6-1.8, WTO Doc. WT/DS384/AB/RW (May 18, 2015). In 2015, the WTO rejected the new May 2013 the USDA regulations and authorized $1.01 billion in retaliatory tariffs against the United States. *See* Arbitrator Decision, *United States—Certain Country of Origin Labelling (COOL) Requirements*, ¶ 7.1, WTO Doc. WT/DS384/ARB (Dec. 7, 2015).

### C.     Today, The USDA Approves—But Does Not Require—Country-Of-Origin Statements For Beef Products.

In 2016, Congress passed the Consolidated Appropriations Act, an omnibus spending bill making country-of-origin labeling ***optional*** for beef products and excluding beef from the definition of "covered commodity." Pub. L. No. 114-113, § 759, 129 Stat. 2242, 2284-85 (2016). Thus, Congress decided that beef retailers are not ***required*** to state a beef product's country of origin.[2]

But contrary to Plaintiff Lucero's claims, the USDA is not "silent" on country-of-origin labeling for beef products. Today, the USDA treats country-of-origin statements like any other optional label statement on a beef product. The USDA continues to approve beef

---

[2] Country-of-origin labeling is still required for products that Congress defined as "covered commodities." *See* 7 U.S.C. § 1638(1) (defining covered commodity); § 1638a(a)(1) ("[A] retailer of a covered commodity shall inform consumers, at the final point of sale of the covered commodity to consumers, of the country of origin of the covered commodity.").

labels. *See* 21 U.S.C. § 607(d). If a producer wants to label its beef product with a country-of-origin claim, it must comply with FSIS's approved standard before doing so.[3]

FSIS explains the standard it applies to country-of-origin claims in its "Food Standards and Labeling Policy Book" ("FSIS Labeling Book").[4] According to the FSIS Labeling Book, "[l]abeling may bear the phrase 'Product of U.S.A.' under one of the following conditions: 1. If the country to which the product is exported requires this phrase, and the product is processed in the U.S., or 2. The product is ***processed*** in the U.S. (i.e., is of domestic origin)." FSIS Labeling Book at 147 (emphasis added).

A review of the USDA's analysis of the meaning of "processed" establishes that slaughtering cattle in the United States makes the product a "Product of the U.S.:

**Labeling to Meet Export Requirements**

. . . . "Product of the U.S.A." has been applied to products that, at a minimum, have been prepared in the United States. It has never been construed by FSIS

---

[3] In ruling on this Motion to Dismiss, the Court may consider FSIS's approval of product labels because they are matters of public record and not subject to any factual dispute. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 n.9 (9th Cir. 2012) ("[A] 'court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment, as long as the facts noticed are not subject to reasonable dispute.'") (quoting *Intri–Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007)); *Shalikar v. Asahi Beer U.S.A., Inc.*, 2017 WL 9362139, at *2 (C.D. Cal. Oct. 16, 2017) (considering agency approvals of food or beverage labels). The FSIS approval process is required by federal law and the Products could not be sold unless the seller complied with that process. *See Kuenzig v. Kraft Foods, Inc.*, 2011 WL 4031141, at *7 n.8 (M.D. Fla. Sept. 12, 2011) ("The regulations relating to the FMIA and the PPIA are clear that Defendants' labels were required to be submitted to the FSIS for approval prior to their use, and given that the labels were, in fact used, the Court will presume that the labels received the FSIS's approval."), *aff'd*, 505 F. App'x 937 (11th Cir. 2013).

[4] Food Safety Inspection Service's Food Standards and Labeling Policy Book, available at https://www.fsis.usda.gov/wps/wcm/connect/7c48be3e-e516-4ccf-a2d5-b95a128f04ae/Labeling-Policy-Book.pdf?MOD=AJPERES (last visited March 9, 2020).

to mean that the product is derived only from animals that were born, raised, slaughtered, and prepared in the United States. *The only requirement for products bearing this labeling statement is that the product has been prepared (i.e., slaughtered, canned, salted, rendered, boned, etc.).* No further distinction is required. In addition, there is nothing to preclude the use of this label statement in the domestic market, which occurs, to some degree.

This term has been used on livestock products that were derived from cattle that originated in other countries and that were slaughtered and prepared in the United States. Also, the cattle could have been imported, raised in U.S. feed lots, and then slaughtered and prepared in the United States. The beef products from these cattle can be labeled as "Product of the U.S.A." for domestic and export purposes.

**Labeling of Imported Beef Products**

Under Section 20 of the FMIA (21 U.S.C. § 620), imported beef products are to be treated as "domestic" product upon entry into the United States.

66 Fed. Reg. 41160, at 41160-61 (Aug. 7, 2001) (emphasis added).

Thus, the **USDA does not require**—as Plaintiff seems to believe it should—that cattle be born, raised, and slaughtered in the United States to qualify as a "Product of U.S.A." In fact, the USDA makes it expressly clear that beef processed in the United States may use that label, even if the product was from imported cattle.

## IV.   LUCERO'S CLAIMS.

Despite the USDA's approval of the beef labels and packaging at issue, Plaintiff filed this putative class action alleging that "reasonable consumers" "are misled and deceived" by Defendants' country-of-origin labeling practices. (Am. Compl. ¶¶ 34-35.)

Lucero alleges this understanding causes consumers, "to buy beef products with more confidence than they might otherwise have, and to pay more for them than they otherwise would. . . ." (*Id.* ¶¶ 10, 58.) According to Lucero, consumers are willing to pay

a premium because they believed purchasing cattle born, raised, and slaughtered in the United States represented something "humane, environmentally sound and/or socially responsible." (*Id.* ¶ 38.)

Lucero claims Defendants' label statements are misleading because—he alleges— Defendants' beef products are made from a "mixture of domestically born and raised cattle (actual 'Product of the U.S.') and imported beef . . . ." (*Id.* ¶ 25.) In other words, Lucero alleges that "since 2015 Defendants have imported cattle for immediate slaughter or for finishing in the United States and then labeled the products derived from those animals as 'Product of the U.S.'" (*Id.* ¶ 5.) Lucero makes these allegations generically and categorically; he does not make any specific allegations about any Defendant's actual beef production practices, much less any specific products.

Based on these allegations, Lucero asserts two claims: (1) violation of the New Mexico UPA and (2) unjust enrichment. (*Id.* ¶¶ 53-67.) Lucero seeks to litigate these claims on behalf of a class consisting of all "ranchers and farmers in the United States who produced beef cattle for commercial sale that were born, raised and slaughtered in the United States" or a New Mexico subclass. (*Id.* ¶ 49.)

## STANDARD OF REVIEW

A motion to dismiss tests the legal sufficiency of a complaint's allegations. *Sillas v. Geo Group, Inc.*, Civ. No. 15-256 JCH/KK, 2015 WL 13651176, at *2 (D.N.M. Oct. 22, 2015) (citing *Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008)). "The court accepts as true all well-pleaded facts, viewing them in the light most favorable to the plaintiff and allowing all reasonable inferences in favor of the plaintiff." *Id*. Dismissal may

be based on either a (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim. *Muller v. Islands at Rio Rancho Homeowners Ass'n*, Civil No. 13-351 LFG/RHS, 2013 WL 12157872, at *4 (D.N.M. Oct. 4, 2013). A claim must be dismissed if the complaint does not contain enough facts to make the claim "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face if the complaint contains sufficient facts for a court to draw an inference that the defendant is liable for the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In addition to the allegations in a complaint, courts deciding a motion to dismiss are also entitled to "consider materials . . . that are part of the public record or materials that are necessarily embraced by the pleadings." *Hawver v. Nuss*, No. 5:14-CV-04084-DGK, 2015 WL 1034375, at *1 (D. Kan. Mar. 10, 2015) (citing *Peterson v. Saperstein*, 267 F. App'x 751, 754 (10th Cir. 2008)). Courts may also take judicial notice of public records without converting a motion to dismiss into a motion for summary judgment. *See SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1192 (D.N.M. 2013) (citation omitted) ("Judicial notice may be taken during any stage of the judicial proceeding, including on a motion to dismiss."); *see also Hodgson v. Farmington City*, 675 F. App'x 838, 840-41 (10th Cir. 2017) ("The district court correctly noted that 'facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.'") (citation omitted); *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 n.1 (10th Cir. 2004). Courts routinely take judicial notice of documents related to federal agencies' conduct. *See, e.g.*, *Gale v. Smith & Nephew, Inc.*,

989 F. Supp. 2d 243, 246 n.2 (S.D.N.Y. 2013) (taking judicial notice of the FDA's public approval of a particular product); *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) (citing cases) ("Public documents issued by government agencies such as the Food and Drug Administration ('FDA') may also be considered.").

In particular, courts take judicial notice of FSIS approvals, including label approval. *Craten v. Foster Poultry Farms Inc.*, No. CV-15-02587-PHX-DLR, 2018 WL 834937, at *3 (D. Ariz. Feb. 13, 2018) ("The Court can judicially notice the fact that the USDA-FSIS inspected and approved for sale all of the raw chicken sold by Foster Farms during the relevant time period . . . ."); *see also Kuenzig v. Kraft Foods, Inc.*, No. 8:11–cv–838–T–24 TGW, 2011 WL 4031141, at *7 n.8 (M.D. Fla. Sept. 12, 2011) (hereinafter, "*Kuenzig I*") ("The regulations relating to the FMIA and the PPIA are clear that Defendants' labels were required to be submitted to the FSIS for approval prior to their use, and given that the labels were, in fact used, the Court will presume that the labels received the FSIS's approval."), *aff'd*, 505 F. App'x 937 (11th Cir. 2013) (hereinafter, "*Kuenzig II*").

## ARGUMENT

## I.    FEDERAL LAW PREEMPTS PLAINTIFF'S CLAIMS.

This is a simple case: Plaintiff challenges USDA-approved labels and seeks to impose a labeling requirement that Congress and the USDA have rejected. But Congress expressly preempted attempts to impose state-law requirements in addition to or different than federal labeling requirements. Plaintiff's claims are therefore preempted by federal law.

Congress has the power to preempt conflicting state laws. *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 791-92 (10th Cir. 2000). Federal preemption comes in three forms: express preemption, field preemption, and conflict preemption. *Id.* at 792; *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998) (describing differences between express, field, and conflict preemption). Express preemption applies when "the language of the federal statute reveals an express congressional intent to preempt state law." *Id.* at 486.

Here, the FMIA includes an express preemption clause mandating that "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia[.]" 21 U.S.C. § 678. The U.S. Supreme Court recently explained that "[t]he FMIA's preemption clause *sweeps widely*" to create a uniform nationwide framework governing the production and labeling of meat products. *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459 (2012) (emphasis added); *see also Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007) ("The FMIA contains an express preemption clause . . . . This preemption clause expressly limits states in their ability to govern meat inspection and labeling requirements." (cleaned up)).

FMIA preemption dooms Plaintiff's claims. As explained above, Plaintiff's Complaint seeks to impose a mandatory labeling regime on beef products that Congress rejected (by removing beef from the list of "covered products") and that conflicts with the USDA's binding guidance on when a beef product qualifies as a "Product of the U.S." *See*

16

*Ranchers-Cattlemen Action Legal Fund v. USDA*, NO: 2:17-CV-223-RMP, 2018 WL 2708747, at *8 (E.D. Wa. Jun. 6, 2018) (entering summary judgment against challenge to USDA's implementation of country-of-origin label requirements because those regulations reflected Congress's intent). It is difficult to imagine a more direct, unavoidable example of an attempt to impose a requirement "in addition to, or different than," those imposed under the FMIA. 21 U.S.C. § 678.

In addition, Plaintiff's claims are preempted because the USDA, using its statutory authority, ***approved*** the labels and label statements that Plaintiff challenges.[5] As explained above, the FMIA expressly authorizes the USDA to approve labels for meat products, 21 U.S.C. § 606, and the USDA's regulations require (subject to exceptions not relevant here) approval of labels, 9 C.F.R. § 412.1(a). (*See supra* 5-7.) Thus, when the USDA approves a meat-product label, that label is allowed under federal law. Any state-law rule that would ban the same label is necessarily different than the federal requirements, and conflicts with the USDA's congressionally mandated role. Thus, USDA label approvals "must be given preemptive effect." *Barnes v. Campbell Soup Co.*, No. C 12-05185 JSW, 2013 WL 5530017, at *5 (N.D. Cal. July 25, 2013).[6]

---

[5] To the extent that Plaintiff's claims are premised on the USDA grade sticker on a beef product, those claims are doubly flawed. The USDA, not any producer or retailer, determines whether a cut of beef qualifies for a particular USDA grade and applies the appropriate grade. (*See supra* 6-7.)

[6] This issue does not come up in many food-labeling cases because the USDA's relevant approval authority applies only to meat and poultry products. Food labeling cases that challenge FDA-regulated products present a different preemption inquiry, because FDA does not require—nor does it perform—label preapproval of the food products it regulates.

When, as here, a plaintiff challenges a meat-product label that the USDA has approved, those claims are expressly preempted. *E.g.*, *Kuenzig II*, 505 F. App'x at 938-39 (affirming district court's dismissal of plaintiff's claims as "preempted by federal law"); *Webb v. Trader Joe's Co.*, Case No.: 19-CV-1587-CAB-WVG, 2019 WL 5578225, at *3-4 (S.D. Cal. Oct. 29, 2019) (noting that plaintiff's state law claims "would effectively impose" an additional labeling requirement and "undermine federal agency authority"); *Craten v. Foster Poultry Farms Inc*., 305 F. Supp. 3d 1051, 1060-61 (D. Ariz. 2018) (concluding that a failure-to-warn claim challenging a label that had been preapproved by the FSIS was preempted by the PPIA); *La Vigne v. Costco Wholesale Corp.*, 284 F. Supp. 3d 496, 507-11 (S.D.N.Y. 2018) (noting, among other things, that FSIS review "includes a determination of whether a label is false or misleading," so a jury finding for the plaintiffs "would directly conflict with the FSIS's assessment" and "introduce requirements in addition or different from those imposed by" federal law (internal citations omitted)); *Phelps v. Hormel Foods Corp.*, 244 F. Supp. 3d 1312, 1316-18 (S.D. Fla. 2017) ("FSIS's preapproval of a label 'must be given preemptive effect' over state-law claims that would effectively require the label to include different or additional markings." (citation omitted)); *Brower v. Campbell Soup Co.*, 243 F. Supp. 3d 1124, 1128-29 (S.D. Cal. 2017) (finding plaintiff's claims preempted where the FSIS previously found no fault with the labels at issue); *Trazo v. Nestle USA, Inc.*, 2013 WL 4083218, at *7-8 (N.D. Cal. Aug. 9, 2013) (concluding that "allowing a jury to weigh in on preapproved USDA labels would surely conflict with the federal regulatory scheme" as a negative "jury verdict would

improperly 'trump' the USDA's authority"), *reconsidered on other grounds*, 113 F. Supp. 3d 1047 (N.D. Cal. 2015); *Meaunrit v. ConAgra Foods Inc.*, 2010 WL 2867393, at *6-7 (N.D. Cal. July 20, 2010) (citing cases rejecting state-law challenges to federally approved labels); *Meaunrit v. Pinnacle Foods Grp.*, 2010 WL 1838715, at *7 (N.D. Cal. May 5, 2010) ("To allow a jury to pass judgment on Defendant's labels, notwithstanding the USDA's approval, would disrupt the federal regulatory scheme."); *Arnold v. Kroger Co.*, 45 N.E.3d 1092, 1094-95 (Ohio App. 2016) (finding challenge to label statement preempted); *Am. Meat Inst. v. Leeman*, 180 Cal. App. 4th 728, 761 (2009) (finding state law provisions requiring point-of-sale warnings that were "in addition to, or different than" the labeling required by the FMIA were preempted).

Plaintiff seeks to impose a beef labeling standard different from the USDA's and he challenges product labels approved by the USDA. These claims are "in addition to, or different than," the federal requirements and are therefore preempted.

## II.   PLAINTIFF'S CLAIMS ARE BARRED BY THE DORMANT COMMERCE CLAUSE.

Plaintiff's claims also fail because they discriminate against "foreign" commerce in violation of the U.S. Constitution's Commerce Clause.

### A.   The Dormant Commerce Clause Prohibits State Action That Discriminates Against Foreign Or Interstate Commerce.

The Commerce Clause of the U.S. Constitution grants Congress the power "[t]o regulate Commerce with foreign nations, and among the several states . . . ." U.S. Const. art. I, § 8, cl. 3. The federal government's power over foreign and interstate commerce is "exclusive and plenary," *Board of Trustees of Univ. of Ill. v. United States*, 289 U.S. 48,

57 (1933), and its power over foreign commerce is "pre-eminently a matter of national concern," *Japan Line, Ltd. v. Los Angeles Cty.*, 441 U.S. 434, 448 (1979); *United States v. Durham*, 902 F.3d 1180, 1204 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 849 (2019) (recognizing that the foreign commerce clause confers "broader authority on Congress" than the interstate commerce clause of the Constitution).

The Constitution—through what is often called the Dormant Commerce Clause—also limits the power of the states to erect barriers to trade. *Hughes v. Oklahoma*, 441 U.S. 322, 336-37 (1979); *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 909 (3d Cir. 1990) (holding that Dormant Commerce Clause "prohibits many discriminatory state regulations designed to promote local enterprise at the expense of that from other states or from foreign countries"). This dormant or negative aspect of the Commerce Clause applies to Congress's power over both *foreign* and interstate commerce. *Durham*, 902 F.3d at 1204 (citing *Japan Line*, 441 U.S. at 434) ("The dormant Commerce Clause doctrine extends to state regulation that may conflict with Congress's foreign commerce regulatory authority."). Thus, states cannot impose barriers designed to benefit domestic economic interests by burdening foreign or out-of-state competitors. *See, e.g.*, *Bacchus Imports, Ltd.*, *v. Dias*, 468 U.S. 263, 268-71 (1984).

When a state law (or a state-law complaint) seeks to regulate foreign commerce, courts apply a heightened standard of scrutiny, which takes two different forms. First, courts will strike down state actions that would prevent the federal government from "speaking with one voice" on matters of foreign commerce. *Japan Line*, 441 U.S. at 451.

Applying this concept, the Supreme Court in *Japan Line* struck down California's attempt to impose an ad valorem tax on a Japanese company's cargo containers:

> If a novel state tax creates an asymmetry in the international tax structure, foreign nations disadvantaged by the levy may retaliate against American-owned instrumentalities present in their jurisdictions. Such retaliation of necessity would be directed at American transportation equipment in general, not just that of the taxing State, so that the Nation as a whole would suffer. If other States followed the taxing State's example, various instrumentalities of commerce could be subjected to varying degrees of multiple taxation, a result that would plainly prevent this Nation from "speaking with one voice" in regulating foreign commerce.

*Id.* at 450-51.

Second, courts also strike down state actions that regulate foreign commerce under the familiar two-part standard applied to regulations of *interstate commerce*. Under this interstate-commerce standard, courts first determine whether the state action "discriminates against interstate commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 99 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). A state action may be deemed discriminatory because of its purpose or its effect. *See Bacchus*, 468 U.S. at 270-71 (purpose); *Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978) (effect). "If a restriction on commerce is discriminatory, it is virtually *per se* invalid," *Oregon Waste*, 511 U.S. at 99; *Maine v. Taylor,* 477 U.S. 131, 148 & n.19 (1986) (holding discrimination results in automatic invalidation, even "to laws that respond to legitimate local concerns by discriminating arbitrarily against interstate trade"). If a state action is not discriminatory, courts will strike it down if "the burden

imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

As explained below, Plaintiff's claims violate the Dormant Commerce Clause under each of these tests.

### B.   Plaintiff's Complaint Fails Because It Seeks To Impose a Beef Labeling Scheme That Would Interfere with Foreign Commerce.

The gravamen of Plaintiff's Complaint is that New Mexico law creates a *state-specific* labeling scheme requiring beef products to disclose where a cow was "born, raised, and slaughtered."[7] For example, Plaintiff asks the Court to enter "an injunction against Defendants' unlawful and deceptive acts and practices, and . . . requiring that any Products from cattle that are not born, raised, and slaughtered in the US be labeled in a way to disclose the accurate and complete origination of the Product." (*See* Am. Compl. Prayer for Relief § E.)[8]

---

[7] Plaintiff invokes various New Mexico laws as the basis for this discriminatory scheme. The Commerce Clause precludes state activity *in any form*, impinging on Congress' ability to exercise its constitutional Commerce Clause power. *See United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942) ("[N]o form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress."). If New Mexico's UPA or unjust enrichment laws did in fact create the labeling scheme Plaintiff suggests, those state laws would be unconstitutional.

[8] As explained above (*see supra* 8-12), the labeling standard that Plaintiff now claims New Mexico imposes was imposed by federal law *until Congress* amended the law to remove that requirement. *See generally* Cassidy L. Woodard, *From Cattle Drives to Labeling Legislation: The Implications of Mandatory Country of Origin Labeling on the Beef Industry*, 47 Tex. Tech L. Rev. 399 (2015). Under that prior regime, beef retailers were required to use labels that "specifically identify the production steps occurring in each country (e.g., 'Born and Raised in Country X, Slaughtered in the United States')." *See* 7 C.F.R. § 65.300(e) (effective May 24, 2014 to March 1, 2016). But, as Plaintiff concedes, *those federal requirements no longer apply to beef labels*. (Am. Compl. ¶ 4.)

Plaintiff's attempt to use New Mexico law to impose a labeling regime governing allegedly "foreign" beef violates the dormant Foreign Commerce Clause. The result is the same whether the Court applies *Japan Line*'s "one voice" standard or the two-step standard typically applied in interstate commerce cases.

***First***, Plaintiff's state-law claims would self-evidently prevent the nation from speaking with "one voice" on what beef is a product of the United States. New Mexico could adopt one standard, Massachusetts another, and the USDA yet another. This kind of "asymmetry" is fatal. *See Japan Line*, 441 U.S. at 450-51 ("If other States followed the taxing State's example, various instrumentalities of commerce could be subjected to varying degrees of multiple taxation, a result that would plainly prevent this Nation from 'speaking with one voice' in regulating foreign commerce.").

Along the same lines, if Plaintiff succeeded in imposing a beef labeling standard through New Mexico law, nations "disadvantaged" by that standard might not limit their retaliation to products of New Mexico, so "the Nation as a whole would suffer." *Id.* at 450. In fact, that type of country-wide retaliation is precisely what happened when federal law imposed the labeling regime Plaintiff seeks: the WTO authorized over $1 billion in retaliatory tariffs. (*See supra* at 9-10.)

***Second***, Plaintiffs' proposed labeling regime is unconstitutional because it imposes "differential treatment" benefiting local commerce at the expense of foreign commerce and is therefore discriminatory. *See Oregon Waste*, 511 U.S. at 99.

Other federal courts have reached exactly this conclusion when considering state-law attempts to impose labeling requirements on allegedly "foreign" products. For example, in *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310 (1st Cir. 2012), the First Circuit considered a Dormant Commerce Clause challenge to two Puerto Rican laws, which required (1) that all construction projects funded by Puerto Rico use cement produced in Puerto Rico ("Law 109"), and (2) that all imported cement bags be labelled with warnings that they may not be used for government contract work ("Law 132"). *Id.* at 316. The First Circuit struck down the labeling requirements because "state laws that on their face discriminate against foreign commerce are almost always invalid. Law 132 is such a law: it requires companies that sell foreign cement to place a different label on their products than companies that sell domestic cement." *Antilles Cement Corp.*, 670 F.3d at 331 (cleaned up). So too here.

Along the same lines, the Supreme Court considered a Dormant Commerce Clause challenge to a North Carolina law that required all apple containers shipped into the state to contain either a USDA label or none at all. *Hunt*, 432 U.S. at 337. There, the state of Washington challenged North Carolina's law as discriminatory because Washington had created its own extensive and respected state inspection and labeling program, which added value to Washington apples. *Id.* at 336-39. The Supreme Court struck down the North Carolina law, holding it had "the practical effect of not only burdening interstate sales of Washington apples, but also ***discriminating against them***." *Id.* at 350 (emphasis added). Again, this is precisely what Plaintiff's Complaint seeks to accomplish.

As these cases make clear, the Dormant Commerce Clause precludes Plaintiff's attempt to use New Mexico law to override Congress's decision and impose a discriminatory labeling regime on what Plaintiff—but not Congress or the USDA—considers to be "foreign" beef.

## III. PLAINTIFF'S CLAIMS SHOULD BE DISMISSED UNDER THE PRIMARY JURISDICTION DOCTRINE.

Even if Plaintiff's claims were not preempted and barred by the Commerce Clause, the Complaint should still be dismissed under the primary jurisdiction doctrine. This doctrine "comes into play whenever . . . the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[.]" *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956); *see also S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 750 (10th Cir. 2005), *as amended on denial of reh'g* (2006). In evaluating whether to defer to an agency's primary jurisdiction, the courts consider, for example, (1) whether the court "is being called upon to decide factual issues not within the conventional experience of judges"; (2) "whether defendants could be subjected to conflicting orders of both the court and the administrative agency"; (3) "whether the agency has demonstrated diligence in resolving the issues or has instead allowed the issues to languish"; and (4) the type of relief requested by the plaintiff. *See Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1349-1350 (D.N.M. 1995). Generally, though, "agency expertise is the most common reason that courts apply the doctrine of primary jurisdiction." *See Taradejna v. General*

*Mills, Inc.*, 909 F. Supp. 2d 1128, 1134 (D. Minn. 2012). Here, all of the factors weigh in favor of deferring to the USDA's expertise.[9]

<u>Factor 1.</u> The technicalities of beef processing and the USDA's application of its regulations and requirements are not factual issues typically presented to courts. The USDA, on the other hand, reviews and analyzes country-of-origin labeling routinely. As explained above, when and how a meat-product manufacturer may make a country-of-origin statement on its labels is an issue—squarely presented by this case—that unquestionably lies within the jurisdiction of the USDA. (*See supra* 5, 11-12.)

<u>Factor 2.</u> Defendants could be subject to competing orders. Defendants' labels are already compliant with USDA's standards. A contrary order here would subject Defendants to differing standards.

<u>Factor 3.</u> The USDA is diligent in its supervision of beef product labeling. Plaintiff has presented no evidence that the USDA has allowed the issue to "languish," because there is none. Furthermore, the Secretary of Agriculture testified before Congress on March 4, 2020, regarding the USDA's ongoing review of country-of-origin labeling requirements.

<u>Factor 4.</u> Finally, Plaintiff seeks to ***require relabeling*** of Defendants' products. That request flies in the face of the USDA's judgment. While Plaintiff also seeks damages, he

---

[9] The USDA is currently considering a petition to change its country-of-origin regulations submitted by the U.S. Cattlemen's Association entitled "PETITION FOR THE IMPOSITION OF BEEF LABELING REQUIREMENTS: TO ADDRESS 'MADE IN USA' OR 'PRODUCT OF USA' CLAIMS." FSIS-2019-0024-0001 (Oct. 23, 2019), https://www.regulations.gov/docket?D=FSIS-2019-0024. (last visited March 9, 2020).

could attempt to seek damages if there were ever a decision by the USDA that Defendants' labels are false.

If Plaintiff disagrees with the USDA's decision to approve the Product labels, the proper route to do so is to petition the USDA, not through this lawsuit. *See* 7 C.F.R § 1.28 ("Petitions by interested persons in accordance with 5 U.S.C. § 553(e) for the issuance, amendment or repeal of a rule may be filed with the official that issued or is authorized to issue the rule."); 9 C.F.R.  § 392.5(a) ("Any interested person may file a petition with FSIS.").

Federal courts in similar circumstances routinely apply the doctrine of primary jurisdiction in deference to agency expertise and regulatory authority. *See, e.g.*, *Barnes*, 2013 WL 5530017, at *8-9; *All One God Faith, Inc. v. Hain Celestial Grp., Inc.*, No. C 09-3517 SI, 2012 WL 3257660, at *11 (N.D. Cal. Aug. 8, 2012) (finding that, because the court "lack[ed] the USDA's expertise," the "appropriate forum for [plaintiff's] complaint is the [USDA]"); *Taradejna*, 909 F. Supp. 2d at 1134-35. Thus, to the extent that Plaintiff's claims are not preempted, they should be dismissed in deference to the primary jurisdiction of the USDA.

## IV.    PLAINTIFF'S UPA CLAIM FAILS AS A MATTER OF LAW.

Lucero's claim under the New Mexico UPA claim fails for two reasons. First, as a competitor, he lacks standing to bring a claim under the UPA, and second, the conduct he challenges falls within the UPA's statutory safe harbor for conduct approved by the federal government.

**A.   As a Competitor, Plaintiff Lacks Standing To Assert A UPA Claim.**

The UPA is intended to protect *consumers*, not competitors, from unfair practices *See Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 113 P.3d 347, 353 (N.M. Ct. App. 2005) (acknowledging the UPA's "purpose as consumer protection legislation"). In November 2019, the New Mexico Supreme Court held that competitors do not have standing to bring claims under the UPA. *Gandydancer, LLC v. Rock House CGM, LLC*, 453 P.3d 434, 436 (N.M. 2019) ("The Court of Appeals . . . held that a business may sue for competitive injury based on a plain reading of the UPA. We reverse because the Legislature excluded competitive injury from the causes of action permitted under that statute.") (citation omitted).

Lucero asserts a claim as a competitor, not a consumer. He asserts that Defendants' beef labeling practices work to his disadvantage in the beef market. (*See, e.g.*, Am. Compl. ¶ 12 ("By deceiving consumers about the true origin of the Products, Defendants are able to sell a greater volume of the Products, to produce cheaper products in other Countries, and ***to take away market share from competitors*** . . . .") (emphasis added).) Accordingly, Lucero lacks standing to assert a UPA claim under *Gandydancer*. *Id.* at 438 ("[T]he UPA does not provide a cause of action for competitive injury claims.") Lucero's claim under the UPA should therefore be dismissed with prejudice.

**B.   Plaintiff's UPA Claim Also Fails Because the Statutory Safe Harbor Permits Defendants' Labeling Practices.**

Even if Plaintiff's UPA claim was not preempted by federal law—and it is—Plaintiff's UPA claim would fail for similar reasons under New Mexico law. Specifically,

the UPA contains a safe harbor clause precluding UPA liability for conduct that is permissible under federal law. Because Defendants' labeling practices are permissible under federal law, specifically under the FMIA and the regulations thereunder, Defendants' conduct cannot constitute an unfair practice under the UPA.

Section 57-12-7 of the New Mexico Statutes contains an exception to liability under the UPA:

> Nothing in the Unfair Practices Act shall apply to **actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico or the United States**, but all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the Unfair Practices Act.

N.M. Stat. Ann. § 57-12-7 (1999) (emphasis added). Courts apply a two-part test to determine whether the safe harbor applies: (1) the defendant's activities generally are subject to regulation by an appropriate state or federal agency, and (2) the specific activity "is in fact permitted by the applicable law or regulation. *See, e.g.*, *Mulford v. Altria Grp., Inc.*, 506 F. Supp. 2d 733, 757-58 (D.N.M. 2007) (citation omitted).

The court in *Zamora v. Wells Fargo Home Mortgage* summarized the safe harbor provision succinctly:

> At a minimum, the regulatory body must actually administer the regulatory laws with respect to the party claiming the exemption, thereby exercising **at least the modicum of oversight** that the exempting language indicates is required. Thus, the party claiming the exemption **must have obtained permission from the regulatory body** to engage in the business of the transaction, thereby subjecting that party to the regulatory body's oversight.

No. CV 12-0048 RB/LFG, 2012 WL 12895364, at *7 (D.N.M. Sept. 18, 2012) (emphasis added; internal quotations and citations omitted)). Applying the *Zamora* standard here,

Lucero's UPA claim clearly falls within the safe harbor provision: because Defendants' labels are USDA-approved, they have undergone the necessary "modicum of oversight" necessary to bring the conduct within the UPA's safe harbor provision.

The Tenth Circuit's decision in *Coll v. First America Title Insurance Co.* is instructive on this point. 642 F.3d 876, 900 (10th Cir. 2011). In *Coll*, the plaintiff alleged the defendant violated the UPA by "charging the same premium, offering the same coverage, using state-mandated forms to sell title insurance, and charging premium rates approved by the superintendent of insurance." *Id.* But under section 57-12-7, the defendant's conduct was "expressly permitted" by the New Mexico Title Insurance Act. *Id.* As a result, the alleged conduct was exempted from UPA liability. *Id.*; *see also Valdez v. State*, 54 P.3d 71, 76 (N.M. 2002) ("Because the rates at issue are under the primary jurisdiction of . . . a regulatory agency, these rates are expressly permitted under Section 57-12-7 of the [Unfair Practices Act] and Section 57-1-16(A) of the Antitrust Act.").

Although it applies Florida's safe-harbor provision, rather than New Mexico's, the decision in *Phelps v. Hormel Foods* is also particularly informative because it applied that safe harbor to claims that a USDA-regulated meat product was labeled in a misleading way. *See* 244 F. Supp. 3d at 1318-19. The *Phelps* court held that "Defendant cannot be liable under FDUTPA because the challenged labels were approved by FSIS and therefore fall within the safe harbor provision." *Id.* at 1318-19. So too here.

When specific conduct is either expressly authorized by statute, or approved by a governmental agency, the conduct cannot form the basis of a UPA violation. Here, FSIS

approved the labels at the heart of Lucero's Complaint, so his claims "are foreclosed by the safe harbor provision because the Complaint does not challenge any aspect of the advertising distinct from the FSIS-approved labels." *Id.* at 1319. Lucero's UPA claim should thus be dismissed with prejudice.

## V.  PLAINTIFF'S UNJUST ENRICHMENT CLAIM FAILS BECAUSE PLAINTIFF'S CATTLE SALES ARE GOVERNED BY EXPRESS CONTRACTS.

Plaintiff's unjust enrichment claim should be dismissed because the transactions at issue—Plaintiff's sales of beef cattle—are governed by express contracts. New Mexico law bars unjust enrichment claims when an express contract between a plaintiff and a defendant governs the subject matter. *Elliott Indus. Ltd. P'ship v BP Am. Prod. Co.*, 407 F.3d 1091, 1117 (10th Cir. 2005); *Abraham v. WPX Energy Prod.,* LLC, 20 F. Supp. 3d 1244, 1276 (D.N.M. 2014); *ABQ Uptown, LLC v. Davide Enters., LLC*, No. CIV 13-0416 JB/KK, 2015 WL 8364799, at *31 (D.N.M. Oct. 19, 2015) ("[E]quitable relief should be denied where there is an available remedy at law . . . ."). New Mexico law also disfavors "an unjust enrichment claim against a third party when that claim involves the same subject as a contract, unless there is something preventing the plaintiffs from pursuing the contract claims." *Abraham*, 20 F. Supp. 3d at 1276 (dismissing unjust enrichment claims against two companies because plaintiffs had express contracts with a third company).

Here, Plaintiff's Complaint does not say whether he sold cattle (1) to any of the Defendants, or (2) to a different beef processor competing with Defendants. He alleges only that he "has produced beef cattle for sale into the commercial beef market." (Am. Compl. ¶ 14.) He further alleges that Defendants have paid "domestic producers like

Plaintiff Lucero" less for their cattle and received "ill-gotten benefits" from "acting unfairly in competition with Plaintiff Lucero and the Class members . . . while diminishing the amounts paid to Plaintiff Lucero and the Class members for their cattle produced for beef." (*Id*. ¶¶ 58, 67).

Regardless of whether Plaintiff sold to a Defendant or to another party, his claims are barred because those sales are governed by express contracts. If he sold to a Defendant, then his unjust enrichment claim against that Defendant is barred by that express agreement. *See Elliott*, 407 F.3d at 1117. If he sold to a third party, then his unjust enrichment claim is barred by that express agreement, because he has not alleged that bankruptcy or a statute prevent a contract claim against the entity buying his cattle. *See Abraham*, 20 F. Supp. 3d at 1276. Plaintiff's unjust enrichment claim fails as a matter of law.

## VI.   PLAINTIFF'S COMPLAINT DOES NOT SATISFY *IQBAL* AND *TWOMBLY*.

The Complaint also fails to satisfy the pleading requirements of *Iqbal* and *Twombly*. To survive a motion to dismiss, "allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). Implausible or conclusory allegations are insufficient. *C.H. v. Los Lunas Sch. Bd. of Educ.*, 852 F. Supp. 2d 1344, 1348 (D.N.M. 2012). The Tenth Circuit has held that "*Iqbal* establishes the importance of context to a plausibility determination." *Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010); *see also Vilar v. Equifax Info. Servs., LLC*, No. CIV 14–0226 JB/KBM, 2014 WL 7474082, at

*26 (D.N.M. Dec. 17, 2014) (citation omitted) (rejecting UPA claim as alleging a "metaphysical possibility" but implausible claim). "[M]ere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Safe Streets Alliance v. Hickenlooper*, 859 F. 3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011)). To be sufficiently plausible, a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Lucero improperly attributes all alleged conduct to all Defendants without describing any individual Defendants' specific conduct. (*See* Am. Compl. ¶¶ 25-30.) Indeed, "the burden rests on the plaintiffs" to ensure a complaint "provide[s] fair notice of the grounds for the claims made against each of the defendants." *Robbins*, 519 F.3d at 1250. The critical inquiry is whether a plaintiff makes clear the precise conduct attributable to each Defendant. *Id.* (citing *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001), which granted a motion to dismiss for failure to provide fair notice under Rule 8 in part because "[t]he complaint failed to differentiate among the defendants, alleging instead violations by 'the defendants'"); *Lane v. Capital Acquisitions & Mgmt. Co.*, No. 04-60602CIV, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006); *Medina v. Bauer*, No. 02 Civ. 8837 (DC), 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)). Because Plaintiff has not made

any attempt to attribute specific conduct to any specific Defendant, he has not pleaded any plausible claims.

Plaintiff also failed to plead a plausible unjust enrichment claim for another reason. The elements of an unjust enrichment claim under New Mexico law are that "(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other side to retain the benefit would be unjust." *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 699 (N.M. Ct. App. 2000). Plaintiff claims that the USDA should enforce a different set of rules regarding beef labeling. (Am. Compl. ¶¶ 2-5). But Plaintiff does not allege that the labels in question are from Defendants. (*Cf. id.* ¶¶ 25-30). Furthermore, Plaintiffs' disagreement with the USDA policies regarding label approval cannot contort Defendants' sale of beef using USDA-approved labels into a supposed "knowing[] benefit" that is "unjust." Thus, Plaintiff has not alleged facts necessary to state an unjust enrichment claim.

## VII.   THE COURT SHOULD DISMISS THE COMPLAINT WITH PREJUDICE.

The Court should dismiss the Complaint and do so ***with prejudice***. Plaintiff's claims fail as a matter of law because they are preempted by federal law and barred by the Commerce Clause. (*Supra* 15-25.) This is a fatal and unfixable defect. It cannot be remedied by more detailed or elaborate pleading, so there is no point in allowing Plaintiff to amend his Complaint. No matter how Plaintiff frames his allegations, his claims will still run directly into the FSIS' approval of the product labels. The Court should, therefore, dismiss the Complaint with prejudice now, just as other numerous other courts have done when ruling on similar changes to FSIS-approved labels. *See, e.g.*, *Kuenzig II*, 505 F. App'x

at 939 (affirming district court's dismissal of plaintiff's preempted claims with prejudice); *Webb*, 2019 WL 5578225, at *4 n.5 ("The Court does not find that any amendment to this claim could possibly cure the deficiency as Plaintiff's claims are expressly preempted."); *Phelps*, 244 F. Supp. 3d at 1319 (dismissing plaintiff's preempted claims with prejudice "[b]ecause any amendment to the Complaint would be futile").

## VIII.   ALTERNATIVELY, THE COURT SHOULD DISMISS FOR LACK OF PERSONAL JURISDICTION.

Lucero's claims all fail as a matter of law. But to the extent the Court concludes he has stated any actionable claims, his Complaint fails to establish personal jurisdiction over any Defendant. The Due Process Clause of the U.S. Constitution requires both that the defendant "have purposefully availed itself of the privilege of conducting activities within the forum State" and that the plaintiff's claim "'arise out of or relate to' the defendant's forum conduct." *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1785-86 (2017) (internal quotation marks, brackets, and citation omitted). Here, Plaintiff cannot show that his claims as to each Defendant arise out of or relate to that specific Defendant's suit-related conduct in New Mexico, because he alleges only that Defendants sell beef *nationally*. *Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("[T]he defendant's suit-related conduct must create a substantial connection with the forum State.").

Even if Plaintiff was able to somehow make that showing as to any particular Defendant, under the Supreme Court's *Bristol-Myers* decision, he *certainly* cannot do so for the putative class members from outside the state. Here, as in *Bristol-Myers*, none of the Defendants is incorporated or headquartered in the forum state, and therefore the Court

has specific jurisdiction over the Defendants only as to their New Mexico conduct. *Id.* at 1782 ("The relevant plaintiffs are not California residents and do not claim to have suffered harm in that State."). The claims of the non-resident members of the putative class have no connection to New Mexico, and the alleged injuries of the New Mexico plaintiffs are not relevant to determining whether *non-residents* can sue in New Mexico. *Id.* ("The mere fact that other plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." (emphasis in original)).

Thus, at minimum, the Court should dismiss the class claims on behalf of any non-New Mexico residents.[10] *See, e.g.*, *Wenokur v. AXA Equitable Life Ins. Co.*, No. CV-17-00165-PHX-DLR, 2017 WL 4357916 at *4 n.4 (D. Ariz. Oct. 2, 2017) ("The Court also notes that it lacks personal jurisdiction over the claims of putative class members with no connection to Arizona and therefore would not be able to certify a nationwide class."); *In re Dental Supplies Antitrust Litig.*, No. 16 Civ. 696 (BMC)(GRB), 2017 WL 4217115, at *9 (E.D.N.Y. Sept. 20, 2017) ("The constitutional requirements of due process do[] not wax and wane when the complaint is individual or on behalf of a class. Personal jurisdiction in class actions must comport with due process just the same as any other case."); *Spratley v. FCA US LLC*, No. 3:17-CV-0062, 2017 WL 4023348, at *7-8 (N.D.N.Y. Sept. 12, 2017)

---

[10] In *Lavigne v. First Cmty. Bancshares, Inc.*, the court concluded that "*Bristol-Myers* does not apply to . . . class action[s]." 330 F.R.D. 293, 297 (D.N.M. 2019). Defendants respectfully submit that this decision is contrary to the weight of authority and that the better-reasoned cases apply *Bristol-Myers*, which addresses ***jurisdictional questions***, regardless of the procedural nature of the claims asserted. *See* 28 U.S.C. § 2702 (procedural rules "shall not abridge, enlarge or modify any substantive right").

(dismissing claims of out-of-state plaintiffs who had "shown no connection between their claims and Chrysler's contacts with New York"); *Plumber's Local Union No. 690 Health Plan v. Apotex Corp.*, Civ. A. No. 16-665, 2017 WL 3129147, at *9 (E.D. Pa. July 24, 2017) (dismissing non-Pennsylvania claims for certain defendants).

## CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated:  March 9, 2020.

MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.

By: /s/ *Alex C. Walker*
Alex C. Walker
P.O. Box 2168
500 Fourth Street NW, Suite 1000
Albuquerque, NM 87103-2168
Email: awalker@modralll.com

-and-

FAEGRE DRINKER BIDDLE & REATH LLP
Tyler A. Young
Michael M. Sawers
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000
Email: tyler.young@faegredrinker.com
michael.sawers@faegredrinker.com

*Attorneys for Defendant Cargill Meat Solutions Corp.*

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: /s/ *Andrew G. Schultz*
Andrew G. Schultz
P.O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 765-5900
Facsimile: (505) 768-7395
Email: aschultz@rodey.com

-and-

MCGRATH NORTH MULLIN & KRATZ, PC LLO
Patrick E. Brookhouser, Jr.

Matthew G. Munro
First National Tower, Suite 3700
1601 Dodge Street
Omaha, NE  68102
Phone: (402) 341-3070
Facsimile: (402) 341-0216
E-mail: pbrookhouser@mcgrathnorth.com
mmunro@mcgrathnorth.com

*Attorneys for Defendant JBS USA Food Company*

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: /s/ *Eric R. Burris*
Eric R. Burris
Debashree Nandy
201 Third Street NW, Suite 1800
Albuquerque, NM  87102
Telephone: (505) 244-0770
Facsimile:  (505) 244-9266
Email:  eburris@bhfs.com
rnandy@bhfs.com

-and-

BRYAN CAVE LEIGHTON PAISNER LLP
Robert M. Thompson
Jennifer A. Jackson
Cassandra R. Wait
1200 Main Street, Suite 3800
Kansas City, MO  64105
Telephone: (816) 374-3200
Facsimile: (816) 374-3300
rmthompson@bclplaw.com
cassie.wait@bclplaw.com

*Attorneys for Defendant National Beef Packing Company LLC*

39

MAYER LLP

By: /s/ Brian J. Fisher
Brian J. Fisher
Armand D. Huertaz
9400 Holly Avenue NE, Building 3B
Albuquerque, NM 87122
Telephone: 505.595.1414
Facsimile: 505.595.1415
Email: bfisher@mayerllp.com
ahuertaz@mayerllp.com

- and –

SHOOK, HARDY & BACON, L.L.P.
Amir Nassihi
One Montgomery Street, 26th Floor
San Francisco, CA 94104
Telephone: 415.544.1900
Email: anassihi@shb.com

Mark Tatum
2555 Grand Boulevard
Kansas City, MO 64108
Telephone: 816.474.6550
Email: mtatum@shb.com

*Attorneys for Defendant Tyson Foods, Inc.*

WE HEREBY CERTIFY that on this 9th day of March, 2020, we filed the foregoing electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

MODRALL, SPERLING, ROEHL, HARRIS
     & SISK, P.A.

By: */s/ Alex Walker*
     Alex C. Walker

*W3707847.DOCX*